# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**CUSTOM MANUFACTURING
AND ENGINEERING, INC.,**

    **Plaintiff,**

**v.**                                                          **Case No.  8:03-cv-2671-T-30MAP**

**MIDWAY SERVICES, INC., et al.,**

    **Defendants.**

_____/

## <u>ORDER</u>

THIS CAUSE comes before the Court upon the following:

1.      Defendants', Midway Services, Inc., Automated Engineering Corporation, MDCO, Inc. and NTU Electronics, Inc., Motion and Memorandum of Law in Support of Defendants' Motion for Summary Judgment (Dkt. #62), and Plaintiff's memorandum of law in opposition thereto (Dkt. #74);

2.      Defendant Judd Sheets' Dispositive Motion for Summary Judgment (Dkt. #63); and Plaintiff's memorandum of law in opposition thereto (Dkt. #75); and

3.      Defendants, Genium, Inc. and James F. Stosic's Dispositive Motion for Summary Judgment (Dkt. #64); and Plaintiff's response thereto (Dkt. #75).

For the reasons set forth below, this Court determines that the foregoing Motions for Summary Judgment should be GRANTED.

## **BACKGROUND**

Plaintiff filed this suit against Defendants on December 22, 2003, asserting a false designation claim (Count One) under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), a violation of Florida's Deceptive and Unfair Trade Practices Act (Count Two) under Florida Statutes § 501.201, *et seq.*, and tortious inference with a business relationship (Count Three) under Florida common law. This Court has jurisdiction over the Lanham Act claim pursuant to 28 U.S.C. § § 1331, 1337 and 1338. It has supplemental jurisdiction over the state law claims.

This lawsuit arises out of a contract between the Plaintiff and Defendant Midway Services, Inc. ("Midway"). Midway is a plumbing, electrical and air conditioning contractor. It does a lot of work with apartment and condominium complexes. As a part of this work, it desired to provide a water meter reading system to its customers that could be read from a remote location. That is, Midway wanted to develop and install a system that would measure water usage without the necessity of someone having to go to each individual unit to read the meter.

Plaintiff Custom Manufacturing and Engineering, Inc. ("Custom"), provides research and development prototyping, fabrication and assembly services to the government and industrial markets. Midway requested Custom to design and manufacture a radio frequency water metering monitoring system ("water metering system"). The parties signed a contract in early 1998. The contract provided that Midway had the right to stop work at any time at its sole discretion.

Pursuant to the contract, Custom designed a system for Midway based on a radio frequency of 418 megahertz.  The system consisted of four primary components: a meter transmitter, a transceiver, a repeater, and a collector.  Each of these separate component parts is enclosed in a plastic housing and cannot be seen unless the housing is removed.  The housing would be removed only as necessary for installation or repair -- both of which were performed by Midway for the units it sold.

Custom had the various component parts manufactured by others.  The component part in question in this case is the printed circuit board ("PCB") which Custom had manufactured by NTU Electronics, Inc. ("NTU").  A PCB is a board with holes and solder-covered copper tracing connecting the holes.  To manufacture a circuit board, one starts with artwork or electronic data and uses machining processes, chemical plating processes, screening processes, and photo imaging processes to create the board.  In a sense, it is much like photocopying a document.  NTU manufactured the requested boards for Custom and, at Custom's direction, placed the following words (the Custom legend) in very small print on the circuit board:

> "MFG BY CUSTOM MANUFACTURING & ENGINEERING, INC.
> FOR
> MIDWAY SERVICES, INC."

Custom contracted with MDCO, Inc. ("MDCO") to assist with the assembly of the water metering system component parts.

Initially, the units worked satisfactorily, but by the fall of 1998, the units began experiencing operational problems.  While the parties agree that the units initially worked

well and later began having problems, the parties strongly disagree on the cause of those problems. Midway thought the transceiver component of the system was the likely cause of the problems. Custom contended that the problems were caused by Midway's improper installation. Various possible solutions were discussed and some were implemented. Still, the problems persisted.

By late 1998, Midway was becoming frustrated with the lack of progress on resolving the problems. Its perception was that Custom either could not or would not fix the system. Midway expressed its dissatisfaction to Custom and that it wished to have third parties look at the system and make recommendations for possible solutions. Custom expressed no objection.

Midway focused on the transceiver component of the system. The transceiver was an intermediate part of the system intended to receive data from one component of the system and to re-transmit it to the next component of the system. More particularly, Midway thought the problem involved radio frequency issues.

In early February, 1999, Midway contacted Defendant Judd Sheets ("Sheets") and requested that he evaluate the system and report on his findings. Sheets thought that the problems related more to the overall system performance rather than radio frequency issues which were his area of expertise. He requested Midway's permission to consult with Genium, Inc. ("Genium") and its president James Stosic ("Stosic"), whom he thought had the necessary expertise.

In mid-February 1999, Sheets called Stosic and asked him to attend a meeting with Sheets and his client, Midway. Sheets explained that Midway was experiencing problems with its 418 megahertz system and was looking for solutions to fix the problem. This meeting took place on February 18, 1999. Midway again explained the problems it was experiencing with the system and that it had been designed by Custom, but did not reveal or discuss with Sheets or Stosic its contractual relationship with Custom.

Within a short period of time, Stosic and Sheets reported their findings to Midway. They identified what they believed to be design flaws in the transceiver component and recommended that it be redesigned. Midway requested Stosic and Sheets to perform the redesign, but they declined because they were too busy. Midway asked them to recommend someone else who could do the redesign work, and they recommended James Baughman ("Baughman") and Randy Bell ("Bell"), who are with Gulfview Research, Inc. and Gigacom, Inc., respectively. Baughman, Bell, Gulfview Research, Inc., and Gigacom, Inc. are not parties to this action.

Baughman and Bell agreed to do the redesign work. Sheets and Stosic met one final time on March 5, 1999, with Midway, Baughman, and Bell to discuss their recommendations. Other than a few short conversations after that date to respond to questions from Baughman and Bell, the involvement of Sheets and Stosic ended at this meeting. Sheets' involvement lasted approximately one month and Stosic's involvement lasted barely more than two weeks. In fact, Stosic spent only 15.3 hours on the project and was paid $994.50.

Baughman and Bell redesigned the transceiver to function only as a receiver.  As this work progressed, Midway needed replacement parts for its existing system.  It had grown increasingly dissatisfied with Custom and therefore turned to others to supply the component parts.  Custom does not contest Midway's right to order these parts from others.  Since Custom had performed the design work for Midway and Midway owned the design, it was entitled to purchase parts from any supplier it wished.

On May 10, 1999, Midway issued a purchase order to Automated Engineering Corporation ("AEC") for all the component parts, including transmitters, transceivers, repeaters, and collectors.  To supply these parts, AEC needed circuit boards.  AEC ordered these PCBs from NTU.  NTU advised it could not use tools and test fixtures belonging to Custom to produce the PCBs and that Midway would need to provide its own set of tools and test fixtures.

Midway provided NTU with the information necessary to construct the PCBs.  It is unclear from the record exactly what this information was, but it was probably an existing circuit board.  It is apparently common within the circuit board manufacturing industry to use an existing circuit board to create the tools necessary to manufacture duplicates.  If a board containing multiple markings is used to make duplicates, a later circuit board manufacturer generally adds its own logo and date code to the board, but will not remove other logos and markings because it does not know the purpose of the other markings.  At any rate, the PCBs

supplied by NTU to AEC contained the existing printing from the earlier board stating that the boards had been manufactured by Custom for Midway.[1]

In addition to the frustrations Midway was experiencing with Custom over the operational problems with the system, it became increasingly dissatisfied with Custom's failure to keep up with its promised delivery schedule. On June 16, 1999, Midway sent a letter to Custom exercising its right to terminate the contract and directed Custom to stop all work. Shortly thereafter, Midway learned that MDCO had previously manufactured some of the components of its meter reading system as a contract manufacturer for Custom. On July 29, 1999, Midway ordered 1,000 meter transmitters from MDCO. Like AEC, MDCO purchased the necessary circuit boards for the 1,000 transmitters from NTU. And, like the circuit boards for AEC, these contained the Custom legend.

At the time, no one noticed that the circuit boards NTU supplied to AEC and MDCO contained the Custom legend. Not only is the print small, the circuit board is contained inside a plastic housing, and is not seen unless the housing is removed.

By July, 1999, Baughman and Bell had completed their redesign. The new receiver had an entirely new circuit board. The new PCB was not manufactured by NTU and did not

---

[1] Custom argues that these boards were not exactly like the originally designed boards because Midway had made changes. There is a dispute in the record about whether changes were actually made, but that is immaterial. Midway owned the design and had the right to make whatever changes it wished. Custom's complaint is not that Midway changed the boards or had them manufactured by NTU, but rather that the Custom legend remained on the boards thereby falsely designating the source of origin.

contain the Custom name.  Other than the boards for the replacement parts supplied by AEC

and MDCO before the new design was implemented, there was no use of the Custom legend.

Later in 1999, the on-going disputes between Midway and Custom resulted in a

lawsuit in state court.  Custom sued Midway for breach of contract asserting it had not been

paid for work it had performed.  Midway counter-sued alleging Custom failed to provide a

working water meter reading system and failed to meet delivery dates.

In discovery, it came to light that some of the replacement parts ordered by Midway

contained the Custom legend.  That gave rise to this suit in federal court in which Custom

asserts that the use of its name on the replacement parts amounts to a false designation of

origin in violation of the Lanham Act and seeks damages and an injunction.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits, if any, show that the

moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The moving

party bears the initial burden of showing the Court, by reference to materials on file, that

there are no genuine issues of material fact that should be decided at trial.  Celotex Corp. v.

Catrett, 477 U.S. 317 (1986).  When a moving party has discharged its burden, the non-

moving party must then "go beyond the pleadings," and by its own affidavits, or by

"depositions, answers to interrogatories, and admissions on file" designate specific facts

showing there is a genuine issue for trial.  Celotex, 477 U.S. at 324.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in a light most favorable to the non-movant, in this case the Plaintiff, and resolve all reasonable doubts in that party's favor. Samples on behalf of Samples v. City of Atlanta, 846 F. 2d 1328 (11th Cir. 1988).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the Court should not grant the summary judgment motion. Augusta Iron and Steel Works v. Employers Ins. of Wausau, 835 F. 2d 855 (11th Cir. 1988). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251.

## DISCUSSION

### Lanham Act Claim

Custom brings its "false designation of origin" claim pursuant to § 43A of the Lanham Act, 15 U.S.C. § 1125(a). In general, the Lanham Act protects consumers from false descriptions of products and services and their origins. Trustco Bank, National Association v. Glens Falls National Bank and Trust Company, N.A., 903 F. Supp. 335 (N.D. N.Y. 1995). The false designation of origin claim is based on 15 U.S.C. § 1125(a)(1)(A) which provides:

(1)     Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which -

    (A)     is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Custom asserts that it "has been damaged by the Defendants' involvement with the improper use and unauthorized distribution of the Custom legend, because it will likely mislead consumers regarding Plaintiff's involvement and consent to the manufacturing of the infringing MDCO transmitters and the AEC components."

To prevail on a false designation of origin claim, a plaintiff must show it was either actually or likely to be damaged by the fact that the defendant used a "false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which (wa)s likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A). See Lipscher v. LRP Publications, Inc., 266 F.3d 1305 (11th Cir. 2001).

The fatal weakness in Custom's claim is that there is no evidence of any likelihood of confusion. Confusion is an essential element of the claim. See Lipscher, 266 F.3d at

1313. This water meter reading system was sold by Midway to apartment and condominium complexes, not to individual consumers. These were not Custom's customers and were not likely to be confused by the appearance of Custom's name in small print on a circuit board completely enclosed inside the housing of the various component parts of the system. The system was installed and maintained by Midway. It is unlikely that anyone other than Midway employees would even see the circuit board, much less be confused about its origin.

Custom also argues that it was "unjustly exposed to liability for said transmitters that it did not consent to the use of and had the opportunity to review for quality control." Custom bases this argument on the idea that if there were a fire, and the fire marshal or some other official suspected the fire was caused by the water meter reading system, and in the event that particular water meter reading system contained a replacement part obtained directly by Midway that bore the Custom legend (rather than being an original part bearing the Custom legend), that might expose Custom to liability. That argument is speculative and will not support a false designation of origin claim.

In addition to damages, Custom contends that it is entitled to enjoin the Defendants from further use of its name. There are two problems with this claim. First, this relief is not available under the Lanham Act unless there is the potential for confusion. 15 U.S.C. § 116(a) provides for injunctive relief "to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under § 1125(a) of this title." There has been no evidence that Custom's mark is registered with the Patent and Trademark Office and, without the likelihood of customer confusion, there is no

violation under § 1125(a).  See International Order of Job's Daughters v. Lindeburg and

Company, 633 F.2d 912 (9th Cir. 1981) (the scope of the Lanham Act is to protect consumers

against deceptive designations of the origin of goods and, conversely, to enable producers

to differentiate their products from those of others, not to protect the business interests of

plaintiffs).

Second, an injunction is not appropriate where there is no likelihood of future

infringement.  The circuit boards in question were supplied in replacement parts for the

original system.  The Custom legend has not been printed on any original or replacement

parts manufactured for Midway after the MDCO order of July, 1999.  That means there had

been use of the Custom name for over four years prior to the filing of the Complaint before

this Court.  Where there is no evidence in the record that casts any doubt upon the good faith

abandonment of the practices which constituted an infringement of a trademark and none to

indicate a probability that such acts would be resumed, an injunction is rightly denied.  Past

acts and practices furnish no basis for injunctive relief when they have been effectively

discontinued.  Fram Corporation v. W. E. Boyd, 230 F.2d 931 (5th Cir. 1956).

As to Defendants Sheets, Stosic and Genium, there is absolutely no evidence that they

had anything to do with the manufacture of the circuit boards for the replacement parts or the

appearance of the Custom legend thereon.  Custom argues that these Defendants are liable

under the theory of "contributory infringement" and cites as authority Bauer Lamp Co., Inc.

v. Shaffer, 941 F.2d 1165 (11th Cir. 1991) and Transdermal Products, Inc. v. Performance

Contract Packaging, Inc., 943 F. Supp. 551 (E.D. Penn. 1996).  To succeed on a claim for

contributory infringement, a plaintiff must show that the defendant "knowingly participated in furthering the trade dress infringement." Bauer Lamp Co., 941 F.2d at 1171. Both cases cited as support by Custom had evidence of "knowing participation." In Bauer Lamp and Transdermal Products, there was evidence that the defendants had requested the manufacture of the infringing items. In the case before this Court, there is no such evidence.

Sheets, Stosic and Genium had limited involvement. They were brought in by Midway to help find solutions to the operational problems being experienced with the water metering system. As requested by Midway, they made suggestions for possible "fixes," but even declined to do the redesign work necessary for the implementation of their suggestions. In fact, they did not even know whether Baughman and Bell would incorporate their suggestions into the redesign. Stosic's involvement was limited to 15.3 hours and Sheets' involvement was not much more than that. For that, they were hailed into this Court under Custom's "contributing infringement" theory.

Custom obviously operates under the strategy of suing first and asking questions later. The evidence is now clear that Sheets, Stosic and Genium did not request the manufacture of the replacement parts and did not have any involvement in the manufacture of either the circuit boards for those parts or the placement of the Custom legend thereon. And, if their suggestions were incorporated by Baughman and Bell into the redesigned system, the evidence is clear that all circuit boards for that system made no mention of Custom. Custom has not even a colorable claim against these three Defendants. For that reason, the Court will entertain Rule 11 sanctions for the inclusion of these three Defendants in this lawsuit.

For the foregoing reasons, the Court will grant summary judgment in favor of Defendants as to the Lanham Act claims.

## UNFAIR TRADE PRACTICES CLAIM

Custom's unfair trade practices claim brought under Florida Statutes is analyzed the same as the Lanham Act claim.  Investacorp., Inc. v. Arabian Investment Banking Corp., E.C., 931 F.2d 1519 (11th Cir. 1991).  Because the Lanham Act claim fails, so does the unfair trade practices claim.

Further, the gist of unfair competition in Florida is "palming off."  B. H. Bunn Co. v. AAA Replacement Parts Co., 451 F.2d 1254 (5th Cir. 1971).  In B. H. Bunn Co., the Fifth Circuit held that the making of replacement parts by copying existing parts is not unfair competition - unfair competition is a question of marketing.  In that regard, the Court said at page 1263:

> The Court below found that Caravalla made parts for Bunn machines simply by dismantling Bunn machines and copying the parts, but without Bunn specifications or drawings.  The record is clear that this was precisely Caravalla's technique, and Caravalla does not deny it.  We note, however, that such methodology of copying is not unlawful.  Unfair competition goes to the question of marketing, not to the question of manufacture.  One may be perfectly within his legal rights in producing an item and yet well without them in his method of selling it if he markets his own item in such a way that there is likely confusion as to the source of manufacture.  (Citation omitted.)

Here, the replacement parts were ordered by Midway and sold to Midway.  Midway was not confused about whose parts they were.  NTU was certainly not "palming off" the replacement circuit boards as being those of Custom.

For the foregoing reasons, all Defendants are entitled to summary judgment on the unfair practices claim.

## <u>TORTIOUS INTERFERENCE CLAIM</u>

Custom also claims that all Defendants tortiously interfered with its contract with Midway.  In their briefs, Defendants point out that Custom obviously knew it had a weak or non-existent tortious interference claim because it either could not or would not answer interrogatories setting forth any supporting facts for that claim.  Custom even failed or refused to answer the interrogatories propounded by the Magistrate Judge on November 5, 2004 (Dkt. #49), requiring Plaintiff to identify the specific facts it claimed supported its tortious interference claim.  Now, at summary judgment time, it is obvious that no such facts exist.

Under Florida law, the elements of tortious interference with a business relationship are: (1) the existence of a business relationship that affords the plaintiff existing or prospective legal rights; (2) the defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff.  <u>Ethan Allen, Inc. v. Georgetown Manor, Inc.</u>, 647 So.2d 812, 814 (Fla. 1994).

MDCO and NTU are the only two Defendants shown to have had knowledge of Custom's contract with Midway.  Custom's claims against the other Defendants, other than Midway, fail because of a lack of evidence of knowledge.  Custom argues that MDCO and NTU circumvented Custom in making direct sales of replacement parts to Midway.  But

since Midway owned the water metering system, it could order parts from whatever source it wished. It was not required to order parts from Custom.

Custom's contract with Midway was terminable at will. In fact, it was terminated before MDCO provided the replacement parts about which Custom now complains. The replacement parts that were provided before the termination of Custom's contract came from AEC. There is no showing that AEC had any knowledge of Custom's contract. Further, when a contract is terminable at will, it is only direct and unjustified interference that is actionable. So long as unlawful or improper means are not employed, activities in which one engages to safeguard or promote one's own financial interest are non-actionable. Perez v. Rivero, 534 So.2d 914 (Fla. 3d DCA 1988).

None of the actions of the Defendants in this case have been shown to be unlawful or to include improper means. NTU, for example, is free to sell circuit boards to anyone who orders them, including Midway. Custom had no exclusive privilege in that regard. The only questionable thing to which Custom can point is the inclusion of the Custom legend on the replacement circuit boards.[2] Whether or not it is standard practice in the circuit board manufacturing industry for existing language to remain on subsequently manufactured boards

---

[2] NTU claims that the inclusion of the Custom legend was standard practice in the circuit board manufacturing industry. NTU asserts that all existing language is routinely left on circuit boards that are copied because the manufacturers do not take the time to decipher the meaning of any writing. Existing writing remains and the manufacturer adds its own logo and date of manufacture. NTU contends that since this is standard practice, it is not the use of improper means. It is unnecessary to resolve this issue since the Court has otherwise determined that no tortious interference claim lies against NTU.

as NTU claims, it is clear that the inclusion of this language in no way interfered with Custom's business relationship with Midway.

The last element, the requirement that Plaintiff suffered damage, is also missing. Custom did not suffer interference damages because of the appearance of the Custom legend on the circuit boards inside the enclosed component parts.

For the foregoing reasons, all Defendants are entitled to summary judgment on the intentional interference claim.

## **CONCLUSION**

For the foregoing reasons, the Court determines that all Defendants are entitled to summary judgment entered in their favor.  It is therefore

ORDERED AND ADJUDGED that:

1.    Defendants', Midway Services, Inc., Automated Engineering Corporation, MDCO, Inc. and NTU Electronics, Inc. Motion for Summary Judgment (Dkt. #62) is GRANTED.

2.    Defendant Judd Sheets' Dispositive Motion for Summary Judgment (Dkt. #63) is GRANTED.

3.    Defendants, Genium, Inc. and James F. Stosic's Dispositive Motion for Summary Judgment (Dkt. #64) is GRANTED.

4.    Custom and its counsel are hereby ordered to SHOW CAUSE, if any it has, **within eleven (11) days** of the date of this Order why Rule 11 sanctions

should not be entered against them for the inclusion of Defendants Sheets, Stosic and Genium in this action.

5.      Jurisdiction is reserved to consider any claims for costs and fees other than Rule 11 sanctions.

6.      All pending motions are denied as moot.  The Clerk is directed to CLOSE this file.

**DONE** and **ORDERED** in Tampa, Florida on April 19, 2005.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Odd\2003\03-cv-2671.msjOrder.frm